THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | Case No.: C70-9213 |
| Plaintiffs, | Subproceeding No. 01-1 (Culverts) |
| vs. | DECLARATION OF RICHARD WHITE IN SUPPORT OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY JUDGMENT |
| STATE OF WASHINGTON, et al., | |
| Defendants. | |

I, Richard White, hereby declare as follows:

1. I am currently Margaret Byrne Professor of American History in the History Department of Stanford University. I have a Ph.D in History, awarded in 1975 from the University of Washington, and have been teaching that topic at the university level since 1976.

2. I have published numerous academic papers and books on the history of the American West, including Native American history and issues. My CV is attached to this declaration.

3. I have been previously certified as an expert witness in U.S. v. Washington Subproceeding No. 89-3 (Shellfish).

C70-9213, Subproceeding 01-1 (Culverts)

DECLARATION OF RICHARD WHITE IN SUPPORT
OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY
JUDGMENT – PAGE 1

Kanji & Katzen, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
206-344-8100

4.      I was asked by counsel for Plaintiff Tribes in this sub-proceeding to investigate the

history of the Stevens Treaties including the intentions, expectations and understandings of the

negotiators of the Stevens Treaties, including Isaac Stevens, George Gibbs, other U.S. Commissioners,

and the Indian negotiators, regarding both the immediate and future implementation of those agreements

and the rights included.  I prepared a written report setting forth the results of that investigation.  This

declaration is a summary of portions of that report.

5.      During the winter of 1854 - 1855, Governor Isaac Ingalls Stevens, assisted by George

Gibbs, and working under directions received from the federal Commissioner of Indian Affairs, George

Manypenny, and his chief clerk, Charles Mix, negotiated three treaties with the Indian villagers living

around Puget Sound.  He then proceeded over the mountains to negotiate a treaty with inland bands and

tribes of whom the current Yakama Nation is a successor.  The treaties of Medicine Creek, Point-No-

Point, Olympia, Point Elliott, and the treaty with the Makah contained virtually identical language,

which would be echoed in the Yakama treaty:

> The right of taking fish at all usual and accustomed grounds and stations, is further
> secured to said Indians, in common with all citizens of the Territory, and of erecting
> temporary houses for the purpose of curing, together with the privilege of hunting,
> gathering roots and berries, and pasturing their horses upon open and unclaimed lands:
> Provided, however, that they shall not take shellfish from any bed staked or cultivated by
> citizens, and that they shall alter all stallions not intended for breeding horses and shall
> keep up and confine the latter.

The treaties Stevens negotiated allotted only small land reservations to tribes on the Sound, "a few spots

in their domains," and lacked any clause allowing the confinement of the Indians to the reservations.

This, and the preservation of fishing rights, reflected the particular realities of life for both Indians and

whites on Puget Sound and in greater Washington Territory.

C70-9213, Subproceeding 01-1 (Culverts)

DECLARATION OF RICHARD WHITE IN SUPPORT
OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY
JUDGMENT – PAGE 2

Kanji & Katzen, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
206-344-8100

6.     The Stevens treaties recognized that by 1854 whites and Indians on Puget Sound had been in steady contact for over twenty years and in sporadic contact for much longer. Indians exchanged fish, furs, and game at Hudson's Bay Company posts, helped build forts, planted and harvested the crops of the Puget Sound Agricultural Company and herded sheep and cattle. Most worked seasonally. Some became plowmen and skilled carpenters and worked the year around. Later, as more American settlers arrived, Indians remained the primary labor force on the Sound. In an 1854 report surveying railroad routes from the Mississippi River to the Pacific Ocean, Gibbs noted that "they provided agricultural labor for the Americans as well as selling them potatoes; they provided them with transportation around the Sound; they carried the mail. And they sold fish and shellfish." The Stevens treaties recognized the interdependence of Indians and whites on the Sound.

7.     Although not all whites hoped that Indians and whites would continue to live and work together in Puget Sound after the adoption of the treaties, the men who gained Stevens' ear recognized the utility of Indians and wanted treaties which would both cede land and leave Indians available to participate in a larger interracial economy. As their meeting notes reveal, the treaty commissioners, including Stevens, recognized that in negotiating with the Indians they were dealing with a people who:

> have been for a considerable time in contact with the whites, have acquired many of their habits and all their vices. They form a very considerable proportion of the trade of the Sound. Many are good laborers and are employed in families, vessels, lumberyards, mills and on farms. They catch most of our fish, supplying not only our people with clams and oysters but salmon to those who cure and export it.

Writing to Manypenny, Stevens argued for a plan that would create a number of small Indian reservations on the Sound, rather than relocating the tribes to a large reservation east of the Cascades or on the Pacific coast:

> There is a strong sympathy for the Indians among the whites. They are very useful in many ways, for transporting persons about the sound in their canoes, &c. Many of the

C70-9213, Subproceeding 01-1 (Culverts)

DECLARATION OF RICHARD WHITE IN SUPPORT
OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY
JUDGMENT – PAGE 3

Kanji & Katzen, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
206-344-8100

men, as laborers, are very useful in chopping wood, plowing, driving wagons, &c. Some
of the women wash clothes well, and in a variety of ways make themselves useful; and, if
confined on reservations, under the direction of efficient agents, I am inclined to think
that but little objection, if any, would be made by the whites.

The Stevens treaties sought to perpetuate the early relations between Indians and whites on the Sound.

8.      One vital part of the relations that Stevens sought to perpetuate was Indian fishing, both
for subsistence and for trade. Stevens and the other treaty negotiators knew well that Puget Sound
Indians relied heavily on their fisheries. Gibbs later observed in his 1877 ethnological monograph,
*Tribes of Western Washington and Northwestern Oregon* that: "The principal food of the Indians on the
west side of the Cascades may be briefly set down as fish, roots, and berries." Stevens made clear to
both the Indians on Puget Sound and the white officials in Washington, D.C., that he planned to preserve
this crucial resource. Treaty minutes reveal that Stevens assured the Indians at Point Elliott that the
Great Father wished his Indians children "to have homes, pastures for your horses and fishing places."
He wished them to learn to farm and to be educated. In return for selling their lands they would "be
provided for all these things." At the same time, Stevens argued in his 1854 annual report to
Manypenny that "It never could have been the intention of Congress that Indians should be excluded
from their ancient fisheries."

9.      The Indians themselves expressed the importance of fishing to their way of life, and
Stevens and the other negotiators assured them of their continued access to the fisheries. Treaty minutes
record that at Point-No-Point, One-lun-teh-tat, an "Old Sko-komish Indian" worried how they were to
feed themselves once they ceded so much land to the whites, while Hool-hole-tan-akim also wanted to
retain half the land. "Why," he asked, "should we sell all? We may become destitute. Why not let us
live together with you?" In the face of such objections, Benjamin F. Shaw, the interpreter, reassured the
Indians that they were "not called upon to give up their old modes of living and places of seeking food,

C70-9213, Subproceeding 01-1 (Culverts)

DECLARATION OF RICHARD WHITE IN SUPPORT
OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY
JUDGMENT – PAGE 4

Kanji & Katzen, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
206-344-8100

but only to confine their houses to one spot." And Michael Simmons, the special Indian agent for Puget

Sound, explained that if they retained a large amount of land they would be confined to it, but that

"when a small tract alone was left, the privilege was given of going wherever else they pleased to fish

and work for the whites." In negotiations at Neah Bay, the Makah raised questions about the role that

the fisheries were to play in their future. Stevens replied that "far from wishing to stop their fisheries, he

intended to send them oil, kettles and fishing apparatus." What Stevens and his negotiators explicitly

promised in response to Indian objections was access to the usual places for procuring food and

continued economic exchange with the whites.

      10.    Stevens sought, as he described in a letter to Manypenny, to preserve Indian access to

fisheries in part to "illustrate, not so much the power as the beneficence and paternal care of the

government." Indeed, Manypenny himself argued in his 1854 report to the President that the

government was obliged to uphold the treaty provisions. The "duty of the government," he wrote, was

"plain." The government had to "fulfil (sic), with the greatest promptness and fidelity, every treaty

stipulation with these Indians." As presented by the whites, the treaties required no choosing between

fishing and farming, between reservations and education. They were to be part of a single, compatible

whole. The Great Father, Stevens told the Indians at Point Elliott, wanted them to be farmers and

artisans, he wanted them to be Christian and educate their children, but he "also wants you to take your

fish and go back to the mountains and get berries." Stevens and Gibbs worried that as whites took up

claims under the Donation Land Act of 1850, they would drive Indians from their fishing grounds. The

men argued that whites whose donation claims encompassed Indian fishing grounds had no right to

monopolize them.

C70-9213, Subproceeding 01-1 (Culverts)

DECLARATION OF RICHARD WHITE IN SUPPORT
OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY
JUDGMENT – PAGE 5

Kanji & Katzen, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
206-344-8100

11.    Stevens also sought to preserve Indian fishing rights to reduce the cost of implementing the treaties.  In his instructions to Stevens, Mix had emphasized that whatever the form of the treaties, they should incur minimal expenses for the government.  Mix began and ended his instructions on the same note of financial caution.  He allowed Stevens to "exercise a sound discretion" in departing from the general instructions, but he was "to leave no question open, out of which difficulties may hereafter arise, or by means of which the Treasury of the United States may be approached."  Stevens believed Mix wanted him to reduce the costs of negotiation and of annuity payments as well as to encourage Indian self-sufficiency.  As the Treaty Commissioners noted in their meeting of December 26, 1854, "it was necessary to allow them to fish at all accustomed places" because this "was necessary for the Indians to obtain a subsistence."  And securing the Indians a subsistence was critical if Stevens was to follow his very clear instructions to keep the cost of the treaty down.  By guaranteeing the Indians a right to their share of the bounty of the land, rivers, and Sound, the treaties would enable them to feed themselves at little cost to the government.

12.    Stevens also preserved Indian fishing rights to encourage continued Indian participation in the interracial economy of the Sound.  By giving Indians access to the commodities they not only used for subsistence but also sold on local markets, the Indians would remain close enough to white settlements to provide necessary labor and to continue to trade with whites.  Stevens argued that the small reserves and the fishing and other rights preserved in Article III would allow "the Indians to catch salmon, gather roots, and berries, pasture their animals on unclaimed land and participate as heretofore in the labor of the Sound."  After detailing to Commissioner Manypenny the centrality of Indian peoples to the economy of the Sound, Stevens argued that the provisions of Article III had "strict reference" to

C70-9213, Subproceeding 01-1 (Culverts)

DECLARATION OF RICHARD WHITE IN SUPPORT
OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY
JUDGMENT – PAGE 6

Kanji & Katzen, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
206-344-8100

1   their actual wants and "to the part they play and *ought to play hereafter* in the labor and prosperity of the

2   territory (emphasis added)."

3         13.   Stevens and the other negotiators believed that the abundant fisheries they had observed

4   in Puget Sound would continue unabated forever. Early white accounts of these fisheries breathlessly

5   reported that they were inexhaustible. J.G. Cooper and G. Suckly, who conducted natural history

6   research in the Pacific Northwest between 1853 and 1857, reported in *The Natural History of*

7   *Washington Territory*..., published in 1859, that "This arm of the sea [Observatory Inlet] was frequented

8   at the time by such myriads of the salmon that a stone could not have reached the bottom without

9   touching several individuals -- their abundance surpassing the efforts of the imagination to conceive."

10   White settlers, like Indians, fed heavily on this abundant resource. Gibbs wrote his mother from Astoria,

11   Oregon to report that salmon were "here in abundance. In fact we get hardly anything else & I don't eat

12   any except particular cuts." More, the negotiators and other whites expected that Puget Sound's

13   fisheries would continue to supply not just the subsistence needs of Indians and whites, but an

14   expanding commercial market as well. Gibbs fully expected a commercial fishery to develop, and he

15   gave no indication that settlement or industrial development on Puget Sound or elsewhere in Western

16   Washington would diminish this fishery. It was not until the 1890s that scientists began to caution that

17   salmon and other stocks might not remain abundant forever.

18         14.   Stevens and the other negotiators anticipated that Indians would continue to fish the

19   inexhaustible stocks in the future, just as they had in the past. Stevens specifically assured the Indians

20   that they would have access to their normal food supplies now and in the future. At the Point Elliott

21   Treaty, Stevens began by speaking of subsistence. "[A]s for food, you yourselves now, as in time past,

22   can take care of yourselves." The question, however, was not whether they could now feed themselves,

C70-9213, Subproceeding 01-1 (Culverts)

DECLARATION OF RICHARD WHITE IN SUPPORT
OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY
JUDGMENT – PAGE 7

Kanji & Katzen, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
206-344-8100

but rather whether in the future after the huge cessions that the treaties proposed the Indians would still be able to feed themselves. Stevens assured them that he intended that the treaty guarantee them that they could. "I want that you shall not have simply food and drink now but that you may have them forever." The negotiators uniformly agreed on the abundance of the fisheries, the dependence of the Indians upon them, their commercial possibilities, and their future "inexhaustibility." Stevens and Gibbs could both foresee and promote the commercial development of the territory, the creation of a commercial fishery by whites, and the continuation of an Indian fishery. They did not see any contradiction between them.

15.     For forty years following the adoption of the treaties, Indians continued to harvest fish for subsistence and trade as they had in years past, and local Indian agents encouraged their efforts. Twelve years after the treaties were negotiated, the Superintendent of Indian Affairs for Washington Territory reported that all the tribes lived by "farming, fishing and the chase." This system proved very durable. A special report by the Board of Indian Commissioners on Western Washington in 1874 predicted that Indians would continue to depend on fishing, logging, and wage labor, and any plan to consolidate the reservations should take this as well as the possibilities for agriculture into account. In 1880, the salmon fishery already formed one-third of the production of the West Coast fisheries, but it was as yet little developed in Puget Sound. "The whole Puget Sound region is very abundantly supplied with fish," the census reported, "but for want of a market the fisheries are little developed and has yet little commercial importance." Although there were now some Chinese, Italian, and Portuguese fishermen on the Sound, Indian peoples were still, twenty-five years after the treaties, the primary fishers on Puget Sound. The fisheries remained abundant. Until Indians were systematically deprived of their fishing rights and the

C70-9213, Subproceeding 01-1 (Culverts)

DECLARATION OF RICHARD WHITE IN SUPPORT
OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY
JUDGMENT – PAGE 8

Kanji & Katzen, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
206-344-8100

1  fisheries began to decline in the late nineteenth and early twentieth centuries, the Indians remained self-

2  supporting.

3        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

4  correct to the best of my knowledge. Executed this ___10___ day of August 2006, at

5  Redwood City_____, California.

6

7

8

9        Richard White

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  C70-9213, Subproceeding 01-1 (Culverts)

DECLARATION OF RICHARD WHITE IN SUPPORT
OF PLAINTIFF-TRIBES' MOTION FOR SUMMARY
JUDGMENT – PAGE 9

Kanji & Katzen, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
206-344-8100

## CURRICULUM VITAE:  January 2005

Richard White                                    Date of Birth - May 28, 1947
Margaret Byrne Professor of American History
History Department
Stanford University, Stanford 94305-2024
e-mail whiter@leland.Stanford.edu


| **EDUCATION**: | 2-66/6-69 | University of California at Santa Cruz | B.A. | 6-69 |
|---|---|---|---|---|
| | 9-70/8-75 | University of Washington | M.A. | 6-72 |
| | | | Ph.D | 12-75 |


**EMPLOYMENT**:   Assistant Professor,  History, Michigan State University,  1976-78
Associate Professor, History, Michigan State University,  1979-83
Associate Professor, History, University of Utah,  1983-90
Professor, History, University of Washington  1990 –98
Margaret Byrne Chair, Stanford University  1998-


## HONORS, AWARDS, FELLOWSHIPS:

President-elect, Organization of American Historians, 2005
Fellowship, Center for Advanced Study in the Social Sciences 2003-04
Autry Humanities Award, 2002
Governor's Award for Remembering Ahanagran, 1999
Member, American Antiquarian Society 1998-
Member, American Academy of Arts and Sciences, 1998-
Governor's Award for The Organic Machine, 1996
MacArthur Fellow 1995-2000
Albert J. Beveridge Award of the AHA for The Middle Ground, 1992
Albert B. Corey Prize jointly awarded by CHA/AHA for The Middle Ground, 1992
Rawley Prize of the OAH for The Middle Ground, 1992
Francis Parkman Prize for The Middle Ground, 1992
American Society of the Colonial Wars Prize for The Middle Ground, 1992-93
Jury Selection, Finalist for Pulitzer Prize, for The Middle Ground, 1992
Western Heritage Award for It's Your Misfortune, 1992
Dee Fellowship, Outstanding Teaching, University of Utah 1987-88
Theodore Blegen Award for Best Article in Forest and Conservation History, 1986
Wheeler-Voegelin Book Prize for Ethnohistory, 1984
Guggenheim Fellowship, 1983-84
Thomas Bushell Award, (teaching) History Department, MSU, 1983
Rockefeller Humanities Fellowship, 1981-82
Forest History Society Book Award, 1981
Theodore J. Blegen Award for the Best Article in Forest and Conservation History 1981
Western History Association Award for Best Article in Western History, 1979
American Philosophical Society Research Grant, 1977
Center for the History of the American Indian, Newberry Library, Fellowship, 1975-76

## CURRENT PROJECTS

### BOOKS

Thinking With Nature  A short book on the ways Americans have appealed to nature to justify social values and how social and cultural values have, in turn, shaped their descriptions of nature.

North American West  I was asked to revise It's Your Misfortune and None of My Own, but it has turned into a whole new project on writing a history of western North America that focuses on lands that for centuries lay beyond imperial and state control.

Transcontinental Railroads   This is my big ongoing project about the cultural, social, economic, and environmental influence of the transcontinental railroads in Canada, Mexico, and the United States.

## SELECTED PUBLICATIONS
### BOOKS

Remembering Ahanagran: Storytelling in a Family's Past (New York, Hill & Wang, 1998)

The Organic Machine (New York, Hill & Wang, 1995).

The Middle Ground:  Indians, Empires, and Republics in the Great Lakes Region, 1650-1815 (New York, Cambridge University Press, 1991).

"It's Your Misfortune and None of My Own:"  A New History of the American West (Norman, University of Oklahoma Press, 1991).

The Roots of Dependency: Subsistence, Environment, and Social Change Among the Choctaws, Pawnees and Navajos (Lincoln, University of Nebraska Press, 1983).

Land Use, Environment, and Social Change: The Shaping of Island County, Washington, 1790-1940 (Seattle, University of Washington Press, 1980).

### Co-Authored

(with James Grossman and Patricia Limerick)  The Frontier in American Culture (Berkeley, University of California Press, 1994).

(with Peter Nabakov, Jay Miller et al) The Native Americans (New York:  Turner Publishing, 1993).

### Edited

(with John M. Findlay), Power and Place in the North American West (Seattle: University of Washington Press, 1999).

## ARTICLES

**Submitted**

**Forthcoming**

"Seventies Environmentalism," in Ken Cmiel and Casey Blake (eds.), <u>Thinking Through the Seventies</u>

Essay for a William and Mary Quarterly issue devoted to my book, <u>The Middle Ground</u>

**Selected Articles**

" The Geography of American Empire," <u>Raritan Review</u> 23 (Winter 2004)

"From Wilderness to Hybrid Landscapes: The Cultural Turn in Environmental History," <u>The Historian</u> 66 (Fall 2004)

"Information, Markets, and Corruption: Transcontinental Railroads in the Gilded Age," <u>Journal of American History</u> 90 (June 2003)

"The Natures of Nature Writing , <u>Raritan Review</u> 22 ( Fall 2002)

"Transcendental Landscapes," in <u>American Victorians and Virgin Nature</u> (Boston: Gardner Museum , 2002),

"Environmental History: Watching a Historical Field Mature," <u>Pacific Historical Review</u> 70, no. 1 (February 2001)

"A Review of Annie Dillard's the Living," in Mark C. Carnes (ed), <u>Historians and Novelists Confront America's Past</u> (and Each Other) (Simon & Schuster: New York, 2001), 109-118

"Is There a North American History?" <u>Revue Française d'études Américaines</u> 79 (janvier 1999)

"Western History," in Eric Foner (ed.), <u>The New American History</u> (Philadelphia: Temple University Press, 1997).

"'Although I am dead, I am not entirely dead. I have left a second of myself': Constructing Self and Persons on the Middle Ground of Early America," in Ronald Hoffman, et al (eds.), <u>Through a Glass Darkly</u> (Chapel Hill: University of North Carolina Press, 1997).

"The Nature of Progress:  Progress and the Environment," in Leo Marx and Bruce Mazlish (eds.) Progress:  Fact as Illusion? (Ann Arbor:  University of Michigan Press, 1996).

"'Are You on Environmentalist or Do You Work for a Living?' Work and Nature" in Uncommon Ground Rethinking the Human Place in Nature (N.Y.:  1995)

"Animals and Enterprise" in Oxford History of the American West," Clyde Milner, Carol O'Connor and Martha Sandweiss (eds), (New York:  Oxford University Press, 1993).

"Discovering Nature in North America,"  The Journal of American History, 79 (December 1992).

"Environmental History, Ecology and Meaning."  The Journal of American History, 76 (1990).

"Ecological Change and Indian-White Relations" (with William Cronon) in Wilcomb Washburn, volume editor, Handbook of North American Indians (Washington, Smithsonian 1988).

"Frederick Jackson Turner" in John R. Wunder, Historians of the American Frontier (N.Y.: Greenwood Press, 1988)

"Race Relations in the American West" American Quarterly 38 (Bibliography Issue) 1987

"American Environmental History:  The Development of a New Historical Field" Pacific Historical Review 54 (August 1985)

"Native Americans and the Environment" in The Scholar and the Indian, William Swagerty, (ed.), (Bloomington, University of Indiana Press, 1984).

"The Altered Landscape: Social Change and the Land in the Pacific Northwest" William Robbins (ed) Regionalism in Myth and Reality (Corvallis, Oregon State University, 1983).

"The Cultural Landscape of the Pawnees," Great Plains Quarterly (Winter, 1982).

"Outlaw Gangs of the Middle Border: American Social Bandits," Western Historical Quarterly 12 (October 1981).

"Shulush Homa: Red Shoes of Couechitto," in Struggle and Survival in Colonial America, Gary Nash and David Sweet (eds.) (Berkeley, University of California Press, 1981).

"Poor Men of Poor Lands: The Back-to-the-Land Movement in the Pacific Northwest," Pacific Historical Review 49 (February 1980).

"The Winning of the West: The Expansion of the Teton Sioux during the Eighteenth and Nineteenth Centuries" Journal of American History 55, (September 1978).

## Book Reviews

I have written numerous book reviews for scholarly journals, and I have written regularly for the  The New Republic, the Los Angeles Times, and the London Review of Books, and Raritan.

## Lectures

I deliver numerous invited lectures each year.  I will list only the major ones for this academic year..

The Merle Curti Lecture Series (3 lectures), University of Wisconsin (Fall, 2004)
The Dillenschneider Lecture Series (3 lectures)  Notre Dame University (Fall 2004)
The Ray Allen Billington Lecture, Huntington Library (Winter, 2005)
The Institute of Historical Studies Inaugural Lecture Series (Winter 2005)

## PROFESSIONAL SERVICE:

### Current Service: 2005

National Organizations

Incoming President, 2006, Organization of American Historians
Board Member:  American Society of Historians

Stanford University

Humanities Center Executive Committee
Board of Modern Thought and Language
Executive Committee for American Studies
Co-director Center for the Study of the North American West

History Department

Search Committee for Nineteenth-Century United States History

Other Units

Co-ordinating Committee, Empires and Cultures

### Outside Service

Pulitzer Prize Nominating Committee for History (2004-05)

Research Proposals

I have served as a referee for the <u>Journal of American History</u>, American Historical Review, <u>Pacific Historical Review</u>, <u>Western Historical Quarterly</u>, <u>Ethnohistory</u>, <u>Pacific Northwest Quarterly</u>, and <u>Great Plains Quarterly</u>, and numerous university presses. I have served the editorial board of the Journal of American History and the Council of the American Studies Association. I have served as president of the Western History Association. I have served on the boards of the Forest History Association, the Institute of the North American West, and the Environmental History Association. I have served as an expert witness for several tribes. I have also served as an advisor to *The West*, *The Oregon Trail* and other documentaries.

I am currently an advisor for an American Experience documentary on the Gold Rush.

**WHITE DEC.**
**PAGE 15**